KEWAUNEE ENGINEERING CORP., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kewaunee Engineering Corp. v. Commissioner
Docket No. 11107-76.
United States Tax Court
T.C. Memo 1979-154; 1979 Tax Ct. Memo LEXIS 371; 38 T.C.M. (CCH) 672; T.C.M. (RIA) 79154; April 18, 1979, Filed Ralph G. Schultz,James A. Feddersen, and Peter J. Stone, for the petitioner. Scott R. Cox, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioner's income taxes for the calendar years 1973 and 1974 in the amounts of $1,810.09 and $79,793.54, respectively. The issues for *372 decision are: (1) Whether the compensation paid by petitioner for the year 1974 to two of its officers, Mr. Fred Peterson and Mr. Robert Peterson, was unreasonable pursuant to section 162, I.R.C. 1954, [1] and if so, the amount of reasonable compensation for these officers; and (2) what is the fair market value of approximately 25 acres of land contributed by petitioner to the City of Kewaunee on December 27, 1973. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, a corporation organized in late 1940 or early 1941, had its principal office at the date of the filing of the petition in this case in Kewaunee, Wisconsin. Its Federal income tax returns for the calendar years 1973 and 1974 were filed with the Director, Internal Revenue Service, Midwest Service Center, Kansas City, Missouri. Petitioner was originally organized by certain residents of the City of Kewaunee who decided that they wanted to form a shipbuilding company. After petitioner was organized, it sent a representative to Washington, D.C. in an effort *373 to obtain shipbuilding work for petitioner from the Navy and the Army. Under the rules in effect by the military services at that time contracts for shipbuilding could not be granted to companies that did not meet certain specifications as to facilities and personnel. Because of their failure to meet the required standards, petitioner's representatives were unable to obtain any Government contract work. After being turned down for Government contract work, representatives of petitioner approached Mr. Fred Peterson and attempted to purchase from him Peterson Boat Works, Inc. (Peterson Boat Works). Peterson Boat Works was an established shipbuilding company which had been originally founded by Mr. Fred Peterson's father in 1907. Mr. Fred Petesron had been active in the business of Peterson Boat Works for about 9 years between the time of its founding and its destruction by fire in 1918. Thereafter, Mr. Fred Peterson had worked for other shipbuilding companies until 1933 when he reactivitated the business of Peterson Boat Works. Under the leadership of Mr. Fred Peterson the business of Peterson Boat Works had quadrupled. The company had grown from a builder of small fishing *374 boats to a builder of yachts and ships for the Government. After Mr. Fred Peterson refused to sell Peterson Boat Works to the organizers of petitioner, representatives of petitioner approached him offering him the position of vice president and general manager of petitioner at a salary of $25,000 a year. Mr. Fred Peterson accepted the offer. Mr. Fred Peterson's salary was set at $25,000 at the first meeting of petitioner's directors. The salaries of petitioner's president and vice president and assistant manager were set at that same meeting at $7,500 a year. At that time, Mr. Fred Peterson owned only one-seventh of petitioner's stock and the other six-sevenths was owned by persons unrelated to Mr. Fred Peterson. At the time Mr. Fred Peterson accepted the position of vice president and general manager of petitioner he was employed as an officer of Peterson Boat Works. Therefore, his service as vice president and general manager of petitioner for $25,000 a year in 1941 was part-time. Under Mr. Fred Peterson's leadership, petitioner became a very successful boat builder and during World War II built over 80 ships for the Government, including the Pueblo, 11 small cargo ships *375 and 51 tugboats. After the conclusion of World War II, when the shipbuilding business became slack, the other stockholders of petitioner wanted to liquidate petitioner and take its assets. Mr. Fred Peterson was not agreeable to this action and the citizens of Kewaunee were anxious to see the plant stay in operation since petitioner was considered the largest employer in Kewaunee. Mr. Fred Peterson made arrangements to buy out the other stockholders of petitioner and continue its business. In 1965, petitioner's plant was destroyed by fire and Mr. Fred Peterson made arrangements to have it rebuilt so that the business would not have to be discontinued. From the time Mr. Fred Peterson became employed by petitioner in 1941 throughout the years here involved, including the entire year 1974, he divided his time between petitioner and Peterson Boat Works. During 1974, Mr. Fred Peterson was president of petitioner and his duties and responsibilities consisted of building up the business and making every effort to keep the business profitable. During 1974, major improvements were made in petitioner's plant and Mr. Fred Peterson was involved with all decisions respecting the building *376 and designing of the improvements, as well as financing and supervising the various projects. Although petitioner's plant is in Kewaunee, Wisconsin, Mr. Fred Peterson's office is located in Sturgeon Bay, where the offices of Peterson Boat Works are also located. During the year 1974, and for a number of years prior thereto, Mr. Fred Peterson's average day at his office in Sturgeon Bay was from 6 a.m. to 6 p.m., 6 days a week. During the years 1973 and 1974, petitioner was in the metal fabricating business, including both prototype and production work. Its products included heavy duty road building equipment, tanks, tractor attachments, engine beds, frames for paymovers (vehicles designed for pushing and towing aircraft), truck frames, mobile crane frames, booms and buckets for front end loaders, earth moving equipment and numerous specialized weldments. Prior to the year 1974 the frames for paymovers built by petitioner had been trucked to Libertyville where they were assembled by International Harvester. In 1973, representatives of International Harvester approached representatives of petitioner inquiring whether petitioner was interested in assuming the assembly or fabrication *377 functions for the paymovers. The representatives of petitioner informed the representatives of International Harvester that petitioner was interested in this project. Mr. Robert Peterson, who in 1974 had over 25 years experience in petitioner's business, had been the project manager for the paymover frames built by petitioner. In 1973, when petitioner also assumed the function of assembling the frames for paymovers, Mr. Robert Peterson was put in charge of the entire project. Mr. Robert Peterson's duties in connection with the paymovers project consisted of planning and scheduling the transfer of materials from Libertyville, starting a new plant and seeing that the paymovers were produced on time and at a profit. The paymover is a complicated piece of equipment, containing over 7,000 parts. The construction of the paymover frame contributed substantially to petitioner's profits in 1974. During 1974, Mr. Robert Peterson met with International Harvester representatives in Libertyville approximately 12 times to discuss engineering and quality control problems. He also met approximately 40 times at Kewaunee or Sturgeon Bay with International Harvester representatives for the *378 purpose of discussing engineering and quality control problems connected with the paymovers. During part of 1974, when the paymover project was getting under way, Mr. Robert Peterson was engaged in work on that project from approximately 7:00 to 7:30 a.m. until 5:30 to 6:00 p.m. daily and on Saturday mornings. In addition, Mr. Robert Peterson was involved in the development of loading ramps and in negotiations with International Harvester regarding the building of a rough terrain forklift, a highway scraper and a small tractor line. As of December 31, 1973, the stock ownership of petitioner was as follows: KEWAUNEE ENGINEERING CORP. STOCK OWNERSHIP
Ownership
No. of Shares
Percentage
International Harvester Co.
336
35.0
Ellsworth L. Peterson
53
5.5
Robert E. Peterson
26
2.7
James R. Peterson
6
0.63
F. J. Peterson II
9
1.0
Margaret L. Titus
9
1.0
Jonlee N. Peterson
3
0.37
Peterson Builders, Inc.
396
41.2
Fred J. Peterson
121
12.6
959
100.0
The stock of Peterson Builders, Inc. [2] was owned principally by Mr. Fred Peterson, Mr. Robert Peterson, Mr. Ellsworth Peterson (Mr. Fred Peterson's son) and their families. During *379 the year 1974, Mr. Robert Peterson, as well as Mr. Fred Peterson, was employed by Peterson Builders, Inc. The total compensation from Peterson Builders, Inc. for 1974 paid to Mr. Robert Peterson was $61,789.34, and the total compensation paid by Peterson Builders, Inc. to Mr. Fred Peterson was $105,429.29. The following schedule shows Mr. Fred Peterson's total compensation from petitioner during the years 1948 through 1977: FRED J. PETERSON
Compensation Year Ending
Bonus
Salary
12/31/77
$ 4,983.70
$28,227.00
12/31/76
13,124.38
26,136.75
12/31/75
30,837.73
24,129.75
12/31/74
65,870.00
21,641.25
12/31/73
1 9,572.96
19,987.50
12/31/72
14,897.79
18,520.00
12/31/71
11,904.40
16,489.98
12/31/70
24,960.08
15,104.15
12/31/6 9
18,758.30
14,300.00
12/31/68
0
13,200.00
12/31/67
0
13,200.00
12/31/66
0
13,200.00
12/31/65
0
13,200.00
12/3 1/64
0
13,200.00
12/31/63
0
13,200.00
12/31/62
0
13,200.00
12/31/61
0
13,200.00
12/31/60
0#h13,200.00
12/31/59 0
13,200.00
12/31/58
0
13,200.00
12/31/57
0
13,200.00
12/31/56
0
12,800.00
12/31/55
0
12,000.00
12/31/54
0
1 2,000.00
12/31/53
0
7,200.00
12/31/52
0
7,200.00
12/31/51
0
7,200.00
12/31/50
0
7,200.00
12/31/49
0
7,200.00
12/31/48
0
3,600.00
*380 Mr. Robert Peterson's compensation from petitioner for the years 1956 through 1977 was as follows: ROBERT E. PETERSON
Compensation Year Ending
Bonus
Salary
12/31/77
$ 2,990.22
$ 9,057.00
12/31/76
7,874.63
8,388.75
12/31/75
18,502.64
7,746.75
12/31/74 39,522.00
6,937.50
12/31/73
11,853.77
6,386.25
12/31/72
8,938.68
5,912.50
12/31/71
7,142.65
5,259.96
12/31/70
2 3,273.31
3,958.27
12/31/69
18,758.30
2,708.29
12/31/68
0
2,499.96
12/31/67
0
2,499.96
12/31/66
0
2,499.96
12/31 /65
0
2,499.96
12/31/64
0
2,499.96
12/31/63
0
2,499.96
12/31/62
0
2,499.96
12/31/61
0
2,499.96
12/31/60
0
2,499.96
12/31/59
0
2,499.96
12/31/58
0
2,499.96
12/31/57
0
2,499.96
12/31/56
0
625.00
The following schedule shows petitioner's total sales and net income for the calendar years 1966 through 1977: KEWAUNEE ENGINEERING CORPORATION
Net Profit Year
Total Sales
Before Taxes
1977
$ 7,099,595 $ 171,439
1976
5,407,538
118,556
1975
10,077,023
1,056,958
1974
13,416,914
2,265,983
1973
8,48 4,249
695,424
1972
6,620,773
466,321
1971
6,305,746
394,330
1970
7,363,446
611,619
1969
7,122,198
531,485
1968
5,466,417
257,632
1967
4,511,234
68,187
1966
4,799,427
364,011
*381 Much of the increase in earning of petitioner in the year 1974 was due to favorable economic conditions in its industry. Petitioner paid dividends of $47,950 on July 3, 1973; January 3 and July 3, 1974; January 3, March 1, and July 3, 1975; January 3 and July 3, 1976; January 3 and July 3, 1977; and January 3, 1978. No dividends were paid by petitioner prior to July 3, 1973. The bonuses paid to Messrs. Fred and Robert Peterson for the years 1969 through 1977 are the result of a bonus plan set up by petitioner in 1969. In 1959, petitioner had set up a bonus plan that covered only those employees who were not stockholders. This plan provided that each of these employees receive a bonus of 2 percent of petitioner's net profit. In 1969, the bonus plan was amended to include all officers and provided for a 3-percent bonus to each participant in the plan. Thereafter, two changes in the bonus plan were made. As of 1974, the percentage bonus to be paid to the various officers of petitioner was as follows: [SEE TABLE IN ORIGINAL] International Harvester first became a stockholder of petitioner in 1970. Before International Harvester purchased 35 percent of petitioner's stock, *382 the president, vice president, and treasurer of International Harvester were informed of petitioner's bonus plan. Also prior to purchasing stock in petitioner, representatives of International Harvester obtained assurances from petitioner's representatives that petitioner's management would not be changed, that the bonus plan was sufficient to retain petitioner's management and that this plan would not be changed without approval by International Harvester. Petitioner's by-laws were then amended at a special meeting held at the offices of International Harvester to provide that matters of importance in petitioner's business, not in the ordinary course thereof, would require the prior approval of International Harvester. For the years 1969 and 1970, Mr. Robert Peterson originally received a 3-percent bonus from petitioner under petitioner's bonus plan. When petitioner's returns for those years were audited by the Internal Revenue Service, an adjustment was made disallowing bonus payments to Mr. Robert Peterson in excess of 1-1/2 percent of profit, and in subsequent years the bonus paid to Mr. Robert Peterson was reduced accordingly. Mr. Ken Trakl was in charge of petitioner's *383 manufacturing plan, and Mr. Howard Balleine was in charge of sales and the personnel office of petitioner. Mr. Ellsworth Peterson was the vice president in charge of operations and general manager of petitioner. His work consisted of the general responsibility for activities of the plant and supervision of the work of other vice presidents, the plant manager, and office manager. It was his responsibility to see that petitioner's personnel was sufficient and its work well performed. Mr. Robert Peterson was secretary of petitioner, as well as being in charge of its paymover operation. Although Mr. Robert Peterson and Mr. Fred Peterson sometimes worked at petitioner's plant at Kewaunee, neither of them had a regular office there. Mr. Fred Peterson worked at the plant between 20 and 30 days in 1974. When he was at the Kewaunee plant and needed office space, Mr. Fred Peterson used a desk in Mr. Ellsworth Peterson's office. A substantial part of the paymover operation supervised by Mr. Robert Peterson was conducted in Sturgeon Bay at facilities furnished to petitioner by Peterson Builders, Inc. There was no significant change in the responsibilities of Mr. Ellsworth Peterson as *384 general manager of petitioner from 1972 to 1974. Mr. Fred Peterson began turning control of petitioner over to Mr. Ellsworth Peterson in 1946. Although Mr. Fred Peterson was involved with most of the final major decisions of petitioner, the preliminary work was generally done by some other officer or employee of petitioner. Mr. Fred Peterson was a bank director and chairman of the board of First National Bank of Sturgeon Bay. He was also chairman of the board of Peterson Builders, Inc. Mr. Fred Peterson's role in connection with his work for petitioner did not vary appreciably during the period 1970 to 1977. Mr. Robert Peterson was in charge of the operations of the manufacturing plant at Peterson Builders, Inc.
In 1973, representatives of the City of Kewaunee approached petitioner with respect to 25 acres of land owned by petitioner at the far northeast edge of the City of Kewaunee between State Highway 42 and the Kewaunee River. This land is a part of the lowlands of the Kewaunee River bed. The representatives of the city told Mr. Fred Peterson that because of an installation on the river bank the Federal engineers had been unable to dredge the Kewaunee river channel *385 properly because of lack of a location to dump the dredging. Kewaunee is an important port on the west side of Lake Michigan, having about two to four ships or car ferries coming in each day. It is important that the channel be kept dredged. It was incumbent on the City of Kewaunee to furnish the dredging area. Representatives of the city stated to Mr. Fred Peterson that they wished to purchase or have donated to the city the 25 acres of land in order to be able to have a proper place for the soil dredged from the channel to be placed. The land which the city was interested in obtaining was low and needed fill to a depth of two to four feet. While the 25 acres would initially furnish a place to dump the dredging from the channel, the dredgings could be spread out over the area, filling in the land so that it could be used as a park or recreational facility. On December 27, 1973, petitioner contributed the 25 acres of land requested by the city to the city. Subsequently, the State Department of Natural Resources determined that the land could not be used as a site for dumping river dredging. The property donated by petitioner to the city is within the city limits of Kewaunee. *386 It is zoned for industrial or commercial use. Its highest and best use is for commercial development or recreational use.Immediately south of this property is a 150-by-250-foot parcel of land which had been filled and used as a boat sales and service store. Close by is another small parcel improved with a small retail cheese outlet. This area had also been filled. South of the cheese outlet is another small parcel which at the time of the trial of this case in 1978 was being filled and improved as a site for a restaurant. South of the location where the restaurant is being built and west to a depth of approximately 700 feet is a boat landing along the river owned and operated by the City of Kewaunee. The balance of the property to the west and south of the donated property to the river is leased by petitioner to the city. The donated property could be used for overflow parking for the nearby public boat ramp or marina-oriented recreational use such as a park, as well as commercial establishments such as the boat sales store or cheese outlet. A triangular northern portion of the property where rail facilities are available is adaptable for light industrial use. The parcel *387 consists of a southern rectangular portion approximately 1,250 feet north to south and 754 feet east to west, and a triangular parcel approximately 350 feet along the west and 754 feet at the south, with the diagonal northern boundary being the tracks of the Green Bay Western Railroad. The larger portion contains approximately 22 acres and the smaller portion approximately 3 acres. State Highway 42 runs along the eastern boundary of the property. The highway begins to ascend about 450 feet north of the southerly boundary of the property. At its highest spot Highway 42 is approximately 30 feet above the northerly boundary of the property, allowing for an underpass for the railroad which runs along the north border of the property. The railroad is 2-to-4-feet above the level of the property. City sanitary sewer and water service the property along the east. Running parallel to State Highway 42, where it is elevated and adjoining petitioner's property, is a gravel-surfaced frontage road serving the entire easterly frontage of the property at grade level. This road connects with Highway 42 (Main Street) toward the southern end of the property. In order to obtain a building permit *388 on most of the 25 acres contributed by petitioner to the City of Kewaunee, it would be necessary that the property be filled. Five pieces of property, three adjacent to the property contributed by petitioner to the City of Kewaunee and two across Peterson Road from that property, have been sold during the period September 27, 1971 through May 9, 1977. The following schedule shows the grantor, the grantee, date of sale, size, and the sales price per square foot of each of these properties: [SEE TABLE IN ORIGINAL] Properties 1 (the boat sales and service store), 2 (the cheese outlet) and 3 (the restaurant under construction) were vacant at the time they were purchased and required fill in order that buildings might be constructed thereon. The fill for these properties was obtained by the purchasers from petitioner free of charge. Property 4 is a vacant parcel which was a part of the 25 acres here involved. It was sold by the City of Kewaunee to Mr. Kleiman for the specific purpose of permitting a building addition to be made to his boat sales outlet known as Tom's Sport Shop (Property 1). The deed required that a building of at least 1,500 square feet be constructed on *389 this property within 2 years from the time of its conveyance, and further provided that in the event the parcel or any part thereof was transferred to another person within 5 years from the date of the deed the city should be paid an additional $3,000 of purchase price, and that this $3,000 would constitute a lien upon the property until paid. Property 5 is a vacant parcel with a frontage of approximately 400 feet on Peterson Road and a depth of 150 feet. This parcel adjoins the westerly boundary of the original Tom's Sport Shop and was purchased by Tom's Sport Shop for expansion. There is no sewer on Peterson Road.The conveyance of Property 5 was by a land contract providing for payment of 6 percent interest. In August 1973, the Wisconsin Public Service Commission conveyed to Gene Slatky and Clarence Ihlenfeldt 220 acres of land with about 6,000 feet of lake frontage on Lake Michigan and approximately 1,300 feet of frontage on the Kewaunee River for $130,000. This property also has about 1,600 feet of frontage on a state highway and is serviced with sewer and water. The property is rolling land, mostly clear and high. The river is not navigable where it fronts on the 220 acres. *390 The lake frontage of the 220 acres is a bluff about 100 feet high. There are ravines running through it. This property is not within the city limits of Kewaunee. It is about a quarter of a mile north of the property donated by petitioner to the City of Kewaunee. [3] The 220 acres is farmland which had never been developed. In August of 1977, one of the grantees of the property from Wisconsin Public Service Commission sold his one-half interest in 78.8 acres of this property for $52,900, which would be $1,343 per acre for a full interest. The property was sold for use as a public camp ground. In August of 1973, a piece of property, northeast of the property contributed by petitioner to the City of Kewaunee, in the City of Kewaunee industrial park was sold for $13,300 or $682 per acre. This property was located on the corner of State Highways 29 and 42 and had sewer connections on State Highway 42. The property donated by petitioner to the City of Kewaunee is bisected on the southwest to *391 the northeast corner by a high tension transmission line. This high tension line creates an easement on the property of 50-to-100 feet. Because of the flood plain area in which the property donated by petitioner to the City of Kewaunee was located, no Veterans' Administration, Federal Housing Administration, or Housing and Urban Development loans could be granted on the property. The cost in late 1973 in Green Bay, which is approximately 30 miles from Kewaunee, of fill was between $1,000 and $1,200 per acre per foot. Properties in the Green Bay industrial park comparable in size to the property petitioner contributed to the City of Kewaunee sold in 1973 at around $8,000 to $8,500 an acre for industrial use and around $12,000 to $12,500 an acre for commercial use. From 1971 through 1977 the yearly inflation rate in value of property around the Kewaunee area averaged approximately 6 percent. Properties 1, 2 and 3, above-listed, all have frontage on State Highway 42. Petitioner, in its income tax return for 1973, claimed a charitable contribution for donation of the 25 acres of land to the City of Kewaunee in the amount of $163,350. Petitioner's deduction for the charitable *392 contribution was limited to 5 percent, an amount of $32,548.14, for the taxable year by section 170(b)(2). On its income tax return for 1974, petitioner claimed deductions for compensation of Mr. Fred Peterson and Mr. Robert Peterson in the following amounts under the notations designated: Fred Peterson
Robert Peterson
Regular Pay
$20,310.00
$ 6,510.00
Vacation Pay
1,331.25
427.50
Bonus
65,870.00
39,522.00
Total
$87,511.25
$46,459.50
Petitioner, on this return, claimed a deduction for contributions of $106,090.05 based on the 5 percent limitation of taxable income allowable for such deduction. The contribution deduction consisted of a portion of the $163,350 claimed by petitioner to be the value of the land donated to the City of Kewaunee in 1973 which was carried over as a charitable deduction carryover to 1974. Respondent, in his notice of deficiency, determined that the value of the land contributed by petitioner in 1973 to the City of Kewaunee was not in excess of $27,800.Respondent also determined that the total compensation paid by petitioner to Mr. Fred Peterson in 1974 was excessive to the extent of $37,700 and the total compensation *393 paid to Mr. Robert Peterson was excessive to the extent of $23,700, making total compensation disallowed of $61,400. Respondent explained his disallowance of the charitable deduction claimed for the land contributed to the City of Kewaunee in excess of the amount of $27,800 by stating that it had not been established that the fair market value of the land on the date it was contributed to the city was in excess of the amount he had determined. Respondent explained the disallowance of the $61,400 in 1974 as excessive compensation by stating that this represented the amount by which the compensation paid by petitioner to Mr. Fred Peterson and Mr. Robert Peterson exceeds a reasonable allowance for salaries for services actually rendered within the meaning of section 162. OPINION Section 162(a)(1) provides for the deduction as an ordinary and necessary business expense by a taxpayer carrying on a trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. Where, as here, respondent has disallowed a portion of the deduction claimed for compensation, it is incumbent on the taxpayer to show that an amount in excess of the *394 amount allowed by respondent is reasonable for the services rendered by the officer or employee. Levenson & Klein, Inc. v. Commissioner,67 T.C. 694, 711 (1977), and cases there cited.Also, as pointed out in Levenson & Klein, Inc. v. Commissioner,supra, and Pepsi-Cola Bottling Co. of Salina, Inc. v. Commissioner,61 T.C. 564, 567, (1974), a comprehensive list of the factors to be considered in making the factual determination of whether salaries paid to officers or employees are excessive was set forth in Mayson Mfg. Co. v. Commissioner,178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court, and includes the employee's qualifications, as well as the nature, extent and scope of his work, and the size and complexities of the business. Also to be considered is a comparison of the salaries paid with the gross and net income of the taxpayer paying the salaries; prevailing general economic conditions; a comparison of salaries with distributions to stockholders; salaries paid for similar work in comparable concerns; the salary policy of the taxpayer with respect to all its employees; and, in the *395 case of small corporations with a limited number of officers, the amount of compensation paid to the particular employee in previous years. Although the action of the board of directors of the corporation, in voting salaries, is entitled to a presumption that the salaries are reasonable and proper, the entire situation must be considered in determining reasonableness with no single factor being decisive.It is likewise settled that where the officers receiving the salaries are controlling stockholders, close scrutiny must be given to determine whether the amounts allegedly paid as compensation are not, in fact, a distribution of profits. Levenson & Klein, Inc. v. Commissioner,supra.
Petitioner argues that since the bonuses paid to Mr. Fred Peterson and Mr. Robert Peterson were pursuant to an agreement reached in 1969 and approved by International Harvester, which acquired 35 percent of petitioner's stock in 1970, they should be viewed as arm's-length agreements and therefore reasonable. The record here shows that the bonus plan had been adopted prior to the time that International Harvester owned any interest in petitioner. The acceptance of the plan by *396 International Harvester, a minority stockholder, even though that company was interested in seeing the management of petitioner remain unchanged, is not comparable to a free bargaining arrangement between unrelated parties. See Hammond Lead Products, Inc. v. Commissioner,425 F.2d 31, 33 (7th Cir. 1970), affg. a Memorandum Opinion of this Court. As petitioner points out, section 1.162-7(b)(2), Income Tax Regs., provides, in part, as follows: Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. However, in our view, this provision is not applicable here. At the time the bonuses were agreed to, the stock of petitioner was owned, directly or indirectly, by the Peterson family. There was no need for a bonus agreement to attract the Petersons *397 to work for petitioner or to give their best efforts to its business. Thereafter, International Harvester acquired a 35-percent stock interest in petitioner. International Harvester did not object to the bonus agreement in connection with its purchase of the stock, but did insist that any change in the plan or any important decision outside the regular operation of petitioner have its prior approval. Prior to the purchase of the stock International Harvester insisted on assurance that petitioner's management would remain the same. In our view, this record does not show the free bargain to obtain the services of an employee referred to in section 1.162-7(b)(2), Income Tax Regs. The Petersons were in complete control of petitioner when the 1969 bonuses were set. This is not the "free bargain" referred to in the regulations. See Adams Tooling, Inc. v. Commissioner,33 T.C. 65, 74 (1959), affd. 289 F.2d 554 (7th Cir. 1961). The record shows that the year 1974 was an exceptionally good year for petitioner. Part of this was due to the services of petitioner's officers, particularly in connection with the new arrangement for assembling the paymovers. *398 However, much of the increased earnings was due to favorable general economic conditions over which petitioner's management had no control. It is also noteworthy that petitioner's bonus plan had been in operation for 10 years from 1959 to 1969 without including officer stockholders. Officer stockholders were only included in 1969 shortly before International Harvester purchased a stock interest in petitioner. Also, the percent bonus of Mr. Robert Peterson had initially been 3 percent, but by the year 1974 had been reduced to 1.5 percent. Though the record is not equally clear, apparently Mr. Fred Peterson's bonus had originally been 3 percent of petitioner's profit and had been reduced to 2.5 percent by the year here in issue. Neither Mr. Fred Peterson nor Mr. Robert Peterson was a full-time employee of petitioner. Mr. Fred Peterson was the president of Peterson Builders, Inc. and also a bank director. The record shows that because of the large earnings in 1974 the compensation paid to Mr. Fred Peterson and to Mr. Robert Peterson was approximately twice that of any prior year, even though there was a minimal increase in the duties of Mr. Fred Peterson in the year 1974 and *399 the increase in Mr. Robert Peterson's duties as compared to prior years was primarily over a short period when petitioner began assembling the paymovers.
Considering the record as a whole, we conclude that petitioner has not shown that the amounts paid to Mr. Fred Peterson and Mr. Robert Peterson in the year 1974 were reasonable compensation for the services rendered by them in that year. However, in our view, respondent's determination does not adequately compensate for the additional duties that Mr. Fred Peterson and Mr. Robert Peterson were required to render because of the increased sales of petitioner in the year 1974 and their contribution to petitioner's increased profits in that year. Considering the record as a whole, we conclude that reasonable compensation for Mr. Fred Peterson for the year 1974, including salary, vacation pay and bonus, is $56,000, and reasonable compensation for Mr. Robert Peterson for 1974, including salary, vacation pay and bonus, is $36,000.
The second issue in this case, like the first, is purely factual. The record shows that on December 27, 1973, petitioner contributed to the City of Kewaunee a 25-acre piece of land. We have set forth in our *400 findings facts with respect to the location of this land and sales of certain pieces of property located in the vicinity of the donated property. At the trial petitioner offered the testimony of two experts and respondent of one. One of petitioner's experts approached the valuation of the property by considering various properties in arriving at his valuation that he did not justify as comparable to the donated property. In connection with other properties, his adjustments for time of sale and size of property were not substantiated. For this reason we have placed little weight on the opinion of this expert. Petitioner's other expert arrived at a value of the property on December 27, 1973, of $125,200 based on sales of various properties, which we have listed as properties 1, 2, 3, 4 and 5 in our findings, located either adjacent or in very close proximity to the property contributed by petitioner to the City of Kewaunee. In each instance, he decreased the sales price of the property by 33 percent because of the difference in the size and shape of the sold property from the property donated. He made adequate adjustments for date of sales and for the presence or absence of utilities. *401 And finally, he made an adjustment for motivation. In connection with the sale of the property by the City of Kewaunee to Thomas R. Kleiman, petitioner's expert made a 100-percent-plus adjustment for motivation. Certainly this property could not be considered on the same basis as the other sales considered by petitioner's expert since the City of Kewaunee sold the property with a requirement of the construction of a building within 2 years from the date of the transfer and a restriction on the resale of any part of the property within 5 years. It is clear that it was in the interest of the city to have the property it sold be improved. For this reason, either the motivation adjustment as made by petitioner's expert is appropriate or the property should not be considered in the determination of comparables. After making his various adjustments, petitioner's expert arrived at a value of 11.5 cents per square foot for the donated property. Multiplying this figure by the 1,089,000 square feet in the 25 acres contributed, he arrived at $125,235 as the fair market value, which he rounded to $125,200. Respondent's expert used certain of the comparables used by petitioner's expert *402 to arrive at the fair market value of a little over two acres of the property contributed by petitioner. The value he placed per square foot on these two acres was 21 cents. For the balance of the property, respondent's expert used a valuation based on the sale of a piece of property in a different location and not usable for the same purposes as the property contributed by petitioner to the city. The donated property was in the city limits of Kewaunee. The "comparable" used by respondent's expert was not. The donated property was zoned industrial. The "comparable" used by respondent's expert was farmland. The donated property was near the Kewaunee harbor. The Kewaunee River was not navigable where it bordered the "comparable" used by respondent's expert. Respondent's expert arrived at a value of $32,700 for the donated property as of July 15, 1975, and adjusting this to December 27, 1973, came out with the value of $27,200 determined by respondent to be the value of the property contributed on that date. In our view, little weight should be given to the value arrived at by respondent's expert since it was largely based on a sale of property which was not comparable to *403 the property being valued.
Respondent's expert justified his approach primarily on the ground that, other than the little over two acres of property which he valued at 21 cents a square foot, the property contributed by petitioner did not have direct access to Highway 42 but rather access to that highway on a frontage road and the fact that the land was low and would require fill for building. The facts show that, after bordering the property contributed by petitioner to the City of Kewaunee for about 450 feet, Highway 42 rose to a level that access to the highway was not available directly from the property. However, access to the highway was available over a frontage road. The record also shows that the property required fill in order to be usable for building. However, the record shows that each of the properties used as a comparable by petitioner's expert witness required fill before a building could be constructed thereon. The record shows that this fill was provided free of charge by petitioner to the purchasers of these properties. Certainly the fact that fill was provided free of charge to purchasers of these properties by petitioner does not require a conclusion that *404 petitioner would have furnished fill free to the city or any purchaser from the city. However, respondent's expert's estimate of the cost of fill was based on Green Bay prices. Use of these prices is not justified considering the accessibility of fill to the property contributed by petitioner. The sales price of industrial and commercial property in Green Bay was far in excess of the value placed by petitioner's expert on the donated property. While we agree generally with the approach to valuation taken by petitioner's expert, we do not agree with his conclusion that no adjustment is needed because the donated property needed fill and did not border directly on Highway 42. In our view, it cannot be assumed that the transferee of the property petitioner contributed to the city would have available fill totally free of charge as did the purchasers of some of the comparable property. Also, property with direct access to Highway 42 has an advantage over property with access only by way of a frontage road. In general, accepting the approach by petitioner's expert but making allowance for the need for fill for the donated property and its access to Highway 42 being over a frontage *405 road, we conclude that the fair market value of the 25 acres of property contributed by petitioner to the City of Kewaunee on December 27, 1973, was $100,000. Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise stated.↩
2. This is obviously the same business which is also referred to as Peterson Boat Works. The record does not show when the name was changed to Peterson Builders. Since the two names were used interchangeably in the record, we will also used them interchangeably.↩
3. Although the valuation report of respondent's expert witness showed this property as 220 acres, in his testimony he stated that the property should have been shown as 243.62 acres.↩